IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ORYAN L. MILLER,**                          Case Number 4:14 CV 2534

      Petitioner,                                Judge Patricia A. Gaughan

      v.                                      Magistrate Judge James R. Knepp, II

**CHRISTOPHER LAROSE,**

      Respondent.                        REPORT AND RECOMMENDATION

### INTRODUCTION

*Pro se* Petitioner Oryan Miller ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Christopher LaRose ("Respondent") filed a Return of Writ (Doc. 7) with attached exhibits. The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated December 16, 2014). For the reasons discussed below, the undersigned recommends the Petition be denied and dismissed.

### FACTUAL BACKGROUND

In habeas corpus review, state court factual findings "shall be presumed to be correct" and a petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial record. *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). Ohio's Eleventh District Court of Appeals made the following factual determinations:

At the trial, Michael Ahladis testified for appellee, the state of Ohio, that his cousin, Delshawn Scrivens, was a marijuana customer of Cameron Murray. Murray resided at 2200 Sandpiper Trail, in the Sawgrass condo development in Howland Township, Trumbull County, Ohio. According to Ahladis, he and Scrivens plotted to burglarize Murray's condo for some quick cash. On December 22, 2008, Scrivens visited Murray and unlocked his back patio door. Around 11:00 a.m. the following morning, Ahladis and Scrivens picked up appellant in Ahladis' green pick-up truck and the three went to a local Wal-Mart to purchase ski masks. While en route, Ahladis stated the three discussed a plan to burglarize Murray's condo. At Wal–Mart, Ahladis phoned his girlfriend, Shawna McElroy, and told her to make a marijuana purchase from Murray and see when he would be leaving his condo. McElroy complied and told Ahladis that Murray was planning to leave his residence right after the transaction. Ahladis purchased two pairs of gloves and three ski masks from Wal–Mart and the three men left the store. Ahladis indicated that each of them had guns, and they continued to discuss burglarizing Murray's condo and splitting the proceeds equally.

After Ahladis pulled up to Murray's condo, Scrivens and appellant knocked on the door. Ahladis stated that when no one answered, Scrivens and appellant went around back and entered the unit from the patio door that Scrivens had unlocked the previous day. Ahladis left the condo and went to a nearby Burger King.

Michael Theodore, a resident of Sawgrass, testified for the state that he heard a loud noise which sounded like a gunshot. After looking out his door, Theodore saw individuals fighting. He indicated that one of the men wore an orange ski mask and another wore a black or dark blue one. After Theodore retrieved his cell phone, the individuals were gone. About five minutes later, Theodore heard another loud, gunshot-like noise but did not see anything after looking out his door again.

After Ahladis returned to the condo, he saw Murray's vehicle and called Scrivens' cell phone to warn him. Ahladis said that someone answered the phone but did not speak. A few minutes later, Scrivens called Ahladis and told him that he and appellant had been shot. Scrivens and appellant got in Ahladis' pick-up truck and the three drove away. According to Ahladis, appellant told him that a fight ensued between Scrivens and Murray, Murray opened fire, and then appellant shot Murray. Ahladis stated that appellant said he hid his gun "out back."

After leaving the condo, Ahladis pulled down Hollywood Street in Warren, Trumbull County, Ohio, and put Scrivens' gun in a trash can. Ahladis asked his father to dispose of his gun. Because Ahladis thought the police might be in pursuit of his green pick-up truck, he took Scrivens to Trumbull Memorial Hospital in Jody Hayes' Ford Expedition and dropped him off. In the meantime, Hayes drove appellant to Kerby Lee's home to swap vehicles again. Lee took appellant to St. Joseph's Hospital in his Jeep Cherokee.

2

Appellant left blood stains in Lee's vehicle and did not offer any information about the shooting to Lee.

Jamaar Kimble, a friend of Murray's, testified for the state that he arrived at Murray's condo around dusk later that day and noticed that his garage door was open, which he found to be unusual as it was always closed as a precaution due to a previous break-in. Kimble discovered Murray face down in his doorway and believed that he was dead. Kimble alerted nearby construction workers who called 9-1-1.

A team from Howland Township Police Department ("HTPD"), Ohio Bureau of Criminal Investigation ("BCI"), and Trumbull County Homicide Task Force arrived at the scene. Jeffrey Urso, a sergeant with the HTPD, testified for the state that he noticed a mop, ski mask, and zip ties near Murray's body. Sergeant Urso described the scene as one in which a struggle had taken place. Ed Carlini, a special agent with BCI, testified for the state that he discovered and preserved blood drops in the snow and on the back patio door handle of Murray's condo. He also recovered a projectile near the washer/dryer unit, one in the guest bedroom, and two near Murray's body. In addition, Carlini recovered a dark-colored knit hat in the main hallway of the condo next to Murray's body, a bag of marijuana, and a digital scale. Paul Monroe and Frank Dillon, both with the HTPD, recovered approximately $21,600 in cash at Murray's condo.

Officers from Warren City Police Department ("WCPD") were dispatched to both hospitals to interview appellant and Scrivens. Dillon testified for the state that he attempted to interview Scrivens, but he was unconscious and later died. Appellant, however, was interviewed and gave different stories with regard to how he ended up in the hospital with a gunshot wound. Rich Kovach with the WCPD testified for the state that appellant told him he was shot while walking along Ogden and Hall Avenues in Warren. Officers were immediately dispatched to that area but found no evidence of a shooting. Jeff Hoolihan with the WCPD testified for the state that appellant told him that he was shot at Arlington and Roosevelt in Warren and that Lee drove him to the hospital. After further questioning, Hoolihan indicated that appellant said that Hayes drove him to the hospital. Hoolihan also stated that appellant later told him that he ran to his nephew's house after the shooting and that both Lee and Hayes drove him to the hospital.

Nick Roberts with the HTPD viewed security footage from Wal-Mart and testified for the state that he identified Ahladis, Scrivens, and appellant. Roberts saw Ahladis purchase candy, two pairs of gloves, and three ski masks before leaving the store with Scrivens and appellant. Roberts retrieved a copy of the receipt from Wal-Mart, which was submitted as Exhibit 50.

Brenda Gerardi with BCI testified for the state that a mixture of Murray's and appellant's DNA was found on a hat recovered from the right side of

3

> Murray's body as well as from the inside patio door handle of Murray's condo. Gerardi stated that by a profile of one in 18 sextillions, appellant's DNA was detected in blood stains found on the exterior east lawn of Murray's condo. Appellant's DNA was also found on a seat belt buckle in Ahladis' pick-up truck. In addition, Martin Lewis with BCI testified for the state that swabs from appellant's hands indicated he fired a weapon on the day at issue.
>
> Dr. Humphrey Germaniuk, coroner and medical examiner for Trumbull County, testified for the state that he recovered three bullets from Murray's back, left neck, and chest during the autopsy. Dr. Germaniuk ruled Murray's death a homicide due to multiple gunshot wounds.
>
> In April 2009, Ahladis' lawyer informed the prosecutor that appellant hid his gun behind Murray's condo. Paul Monroe, Chief of Police with the HTPD, testified for the state that he searched the area and found a weathered .38 caliber Taurus handgun lodged in a rock pile along a drainage ditch behind Murray's condo. Roberts, who is assigned to the firearm section inside the laboratory of BCI, indicated that the three bullets removed from Murray during the autopsy and the one bullet recovered near his body were all fired by the gun found by Chief Monroe behind Murray's condo.
>
> Following the trial, the jury found appellant guilty of counts one, two, and three, but not guilty on counts four and five.

(Doc. 7, Ex. 2 at p. 1-7).

## **PROCEDURAL BACKGROUND**

The procedural history was accurately summarized in Respondent's brief; therefore, it is incorporated herein with only minor changes. (Doc. 7, at 5-8).

*State Trial Court*

On August 20, 2009, a Trumbull County, Ohio grand jury indicted Petitioner on one first-degree felony Complicity to Murder charge with a firearm specification; two first-degree felony Complicity to Aggravated Burglary charges, each with a firearm specification; and two first-degree felony Complicity to Aggravated Robbery charges, each with a firearm specification. (Doc. 7, Ex. 3).

4

Petitioner had legal representation throughout the trial court proceedings and the case proceeded to jury trial. On November 20, 2009, the jury found Petitioner guilty of the Complicity to Murder charge and firearm specification and the two Complicity to Aggravated Burglary charges and firearm specifications, but not guilty of the two Complicity to Aggravated Robbery charges with firearm specifications. (Doc. 7, Ex. 4).

The trial court sentenced Petitioner to fifteen years to life in prison for the Complicity to Murder conviction; ten years in prison for each Complicity to Aggravated Burglary conviction, merged the two Complicity to Aggravated Burglary convictions for sentencing purposes and ordered the sentence to be served concurrent to Petitioner's Complicity to Murder sentence; and merged the firearm specifications for sentencing purposes and sentenced Petitioner to a mandatory, consecutive and prior three years in prison for the firearm specifications. (Doc. 7, Ex. 1). The trial court sentencing entry was journalized January 5, 2010, and resulted in an aggregate eighteen years to life in prison that has no expiration date. (Doc. 7, Ex. 1).

*Direct Appeal*

On February 4, 2010, Petitioner, through new counsel, filed a timely appeal notice in Ohio's Eleventh District Court of Appeals. (Doc. 7, Ex. 5). Petitioner raised these error assignments on direct appeal:

1. The trial court abused its discretion by permitting Appellee, over objection, to continue its direct examination of Dr. Humphrey Germaniuk after resting.

2. The Appellant's convictions are against the manifest weight of the evidence.

(Doc. 7, Ex. 6). The State filed an answer brief in opposition. (Doc. 7, Ex. 7). On March 7, 2011, the state appellate court overruled Petitioner's error assignments and affirmed his convictions and sentences. (Doc. 7, Ex. 2).

Petitioner did not file a direct appeal in the Ohio Supreme Court.

*Post-Conviction Relief*

On March 25, 2013, Petitioner filed an untimely *pro se* "petition to vacate or set aside judgment under O.R.C. 2953.22 and for an evidentiary hearing" in the trial court. (Doc. 7, Ex. 8). Petitioner raised this claim in his post-conviction relief petition:

1. Mr. Miller's trial counsel was prejudicially ineffective, as a reasonable probability exists that, but for the attorney's bad advice, Mr. Miller would have accepted the State's plea offer, and Mr. Miller would have received a shorter prison sentence.

(Doc. 7, Ex. 8). In his response, the State filed a motion to dismiss Petitioner's post-conviction relief petition without a hearing. (Doc. 7, Ex. 9). On June 7, 2013, the trial court granted the State's motion to dismiss and dismissed Petitioner's post-conviction relief petition without a hearing because the petition was filed 29 months late. (Doc. 7, Ex. 10). Petitioner did not appeal that decision to the jurisdictional state appellate court.

On September 24, 2014, Petitioner filed a "motion seeking leave to amend the pending post-conviction petition pursuant to O.R.C. 2953.21(F)." (Doc. 7, Ex. 11). In response, the State filed a motion to dismiss Petitioner's motion for leave. (Doc. 7, Ex. 12). On October 2, 2014, the trial court denied Petitioner's motion for leave to amend his "pending" petition because Petitioner's post-conviction relief petition was adjudicated June 7, 2013, and no such petition was pending. (Doc. 7, Ex. 13). Petitioner did not appeal that decision to the jurisdictional state appellate court.

## FEDERAL HABEAS CORPUS

Petitioner claims he placed his *pro se* habeas petition in the prison mail system on November 10, 2014. (Doc. 1). Petitioner's habeas petition raises one ground for relief:

> **GROUND ONE**: Trial counsel Sarah Kavoor was ineffective for advising the Petitioner to reject the plea offer of 15-30 years without a reasonable basis.

> **Supporting Facts**: My trial counsel was ineffective for advising me to reject the state's plea offer of 15-30 years without a reasonable basis and had it not been for my trial counsel's advice in which I relied, I would have accepted the plea deal of 15-30 years which is less than the 18 to life I received after being convicted at trial.

(Doc. 1).

## JURISDICTIONAL BAR

*Statute of Limitations*

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") created a one-year limitations period for habeas petitions brought by individuals challenging their state court convictions. 28 U.S.C. §2244(d). Under 28 U.S.C. § 2244(d)(1), the limitations period begins to run from the latest of four events:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

This Petition is governed by § 2244(d)(1)(A) because the factual predicate of Petitioner's claim is neither new nor undiscoverable through due diligence. Cases become final for purposes of § 2244(d)(1)(A) when the time to file an appeal has expired. *Lawrence v. Florida*, 549 U.S. 327, 333 (2007). Here, Petitioner's conviction became final on April 21, 2011 – 45 days after his conviction was affirmed by the Eleventh District and the expiration of the period to seek review

7

by the Ohio Supreme Court. The one-year statute of limitations began running the day after the conviction became final on April 22, 2011, and expired one year later on April 22, 2012. *Williams v. Wilson*, 149 F. App'x. 342, 345 (6th Cir. 2005); *Bronaugh v. Ohio*, 235 F.3d 280, 285 (6th Cir. 2000). Since April 22, 2012, was a Sunday, Petitioner's filing deadline was extended to the next business day, Monday, April 23, 2012. Fed. Civil Rule 6(a)(1)(C). Petitioner did not complete and mail his Petition until November 10, 2014, over two years after the statute of limitations had expired. The Petition is time-barred unless statutory or equitable tolling applies.

*Statutory Tolling*

Under 28 U.S.C. § 2244(d)(2), a properly filed application for state post-conviction or other collateral relief tolls the running of the limitations period until the day the state supreme court decides the case or denies review. *Lawrence,* 549 U.S. 327; *Isham v. Randle*, 226 F.3d 691 (6th Cir. 2000). A state application for post-conviction relief is "properly filed" within the meaning of § 2244(d)(2) "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings, such as those prescribing the time limits for filing." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000).

State courts are the final arbiters of whether a state collateral action is considered timely, and thus, properly filed. *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005). A state post-conviction petition rejected by the state court on timeliness grounds is not properly filed and, therefore, it cannot serve as the basis for statutory tolling. *Allen v. Siebert*, 552 U.S. 3, 5 (2007). Additionally, a federal habeas court must accept a state court's interpretation of that state's statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

Furthermore, while the running of the limitations period may be tolled during the pendency of a "properly filed" application for state post-conviction relief, *Artuz*, 531 U.S. at 8-9,

this statutory tolling provision does not revive the limitations period, it can only serve to pause a clock that has not yet expired. *Searcy v. Carter*, 246 F.3d 515 (6th Cir. 2001). Once the limitations period is expired, state collateral review proceedings can no longer serve to avoid the statute of limitations bar. *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003); *Jurado v. Burt*, 337 F.3d 638, 641 (6th Cir. 2003).

In this case, Petitioner's one-year period began on April 22, 2011, and expired a year later on April 22, 2012. During this period, Petitioner did not have any filings pending in the Ohio courts and thus, is not entitled to any statutory tolling of the limitations period. Further, Petitioner did not file a petition for post-conviction relief until March 25, 2013, almost a year after his AEDPA filing deadline had expired. (Doc. 7, Ex. 8). Even if Petitioner had filed the post-conviction petition during the relevant statutory period, the state court held this petition to be untimely; therefore, it could not serve as a basis for tolling because it was not properly filed. Absent equitable tolling, the Petition is time-barred.

*Equitable Tolling*

"[T]he doctrine of equitable tolling allows federal courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Keenan v. Bagley*, 400 F.3d 417, 421 (6th Cir. 2005) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 560-61 (6th Cir. 2000)). Petitioner bears the burden of proving an entitlement to equitable tolling. *See Griffin v. Rogers*, 308 F. 3d 647, 653 (6th Cir. 2002). Equitable tolling should only be granted "sparingly". *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006).

To be eligible for equitable tolling, a petitioner must prove "1) that he has been pursuing his rights diligently; and 2) that some extraordinary circumstance stood in his way." *Pace v. DiGugliemo*, 544 U.S. 408, 418 (2005). Ineffective assistance of counsel may constitute

9

extraordinary circumstances sufficient to warrant relief. *Robinson v. Easterling*, 424 F. App'x 439, 442 (6th Cir. 2011). However, it only warrants tolling if it was both beyond the control of the litigant and unavoidable with reasonable diligence. *Dunlap v. United States,* 250 F.3d 1001, 1008 (6th Cir. 2001).

Petitioner argues he is entitled to equitable tolling due to ineffective assistance of appellate counsel because his attorney did not inform him of the procedures for filing a post-conviction petition. (Doc. 1, at 21). Namely, appellate counsel did not notify him of the necessity of taking immediate action following the filing of the trial transcript with the appellate court to preserve his post-conviction remedy. (Doc. 1, at 21-22). In support of this argument, Petitioner relies upon a recent Sixth Circuit ruling that held it is ineffective assistance of counsel for an appellate attorney to fail to advise his client about the time constraints for filing a post-conviction petition. *See Gunner v. Welch*, 749 F.3d 511 (6th Cir. 2014). However, this case is distinguishable because *Gunner* was decided in the context of procedural default and not equitable tolling. *See id.* In proving cause to excuse procedural default, a petitioner must only establish an external impediment to compliance with the procedural rules, but equitable tolling requires the additional finding of due diligence on the part of the petitioner.

Here, it cannot be found that Petitioner diligently pursued his rights. Petitioner waited to file a post-conviction petition until three years after first appealing his conviction and two years after the Eleventh District rejected his direct appeal, facts hardly indicative of diligence. (Doc. 7, Ex. 8). Moreover, Petitioner's delay in filing his post-conviction petition is even more untenable when he admits he was aware of the post-conviction process "[d]uring the initial stages of [his] direct appeal" and inquired into such with his appellate attorney. (Doc. 1, Ex. A). Petitioner was free, at any time during pendency of his appeal and, in fact, was instructed by his appellate counsel, to acquire information related to post-conviction filings independently; instead, he

chose to "passively await decision." *Miller v. Collins,* 305 F.3d 491, 496 (6th Cir. 2002). Petitioner's professed ignorance of the law regarding the finite details of filing a post-conviction petition could easily have been remedied by simple inquiry and will not justify equitable tolling, especially when Petitioner was cognizant of the available remedy. *See Johnson v. United States*, 544 U.S. 295, 311 (2005); *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991).

Therefore, even assuming, *arguendo*, Petitioner's appellate attorney was ineffective for failing to notify Petitioner of the time constraints for filing a post-conviction petition and that this constituted an extraordinary circumstance, Petitioner is not entitled to equitable tolling because "acting with reasonable diligence, [he] could have filed on time notwithstanding the extraordinary circumstances." *Robinson*, 424 F.App'x at 443 (quoting *Jenkins v. Greene*, 630 F.3d 298, 303 (2d Cir. 2010)). Ultimately, Petitioner has not carried his burden of proving he acted with sufficient diligence to warrant equitable tolling. *See Keeling v. Warden, Lebanon Correctional Inst.,* 673 F.3d 452, 463-64 (6th Cir. 2012).

In the extreme circumstance, a petitioner can prove his entitlement to equitable tolling through a showing of actual innocence under the "miscarriage of justice" standard. *Schlup v. Delo*, 513 U.S. 298 (1995). In these cases, a credible showing of actual innocence operates to excuse procedural bars that would prevent a habeas petition. *See Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). Petitioner has made no such showing in this case and thus, this Court recommends his Petition be dismissed as time-barred.

## CONCLUSION AND RECOMMENDATION

Regardless of the potential merits of Petitioner's claims, his lack of due diligence has rendered a merits determination impossible. Following review, and for the reasons stated above, the Court recommends the Petition be dismissed.

s/James R. Knepp II<br>
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).